UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

CHRISTOPHER BAYER,

                          Petitioner,

    -against-                                  05 CV 3587 (SJF)

DALE ARTUS, Superintendent,             **OPINION & ORDER**
CLINTON CORRECTIONAL FACILITY

                          Respondent.
_____X

FEUERSTEIN, J.

       Petitioner Christopher Bayer ("petitioner" or "Bayer") brings this action pursuant to 28

U.S.C. § 2254 for a writ of habeas corpus. For the reasons stated below, the petition is denied.

I.      Factual Background

       Petitioner's trial was held in August 2001, in Suffolk County, New York. At trial,

petitioner was accused of committing three separate acts of sodomy and sexual abuse against a

male juvenile victim. The victim, John Spinosa Jr. ("John"), testified that he met petitioner when

he was in the third or fourth grade. (Trial Transcript ["TT"] at 299). John and John's mother,

Joyce, worked with petitioner as clowns. (Id. at 300). John and petitioner both began working

for the Clyde Beatty Cole Brothers Circus (date unknown). (Id. at 303, 306). John testified that

petitioner started as an "on-show clown" but eventually became the "advance clown," where

petitioner would go to a city or town two weeks ahead of the circus's arrival in order to promote

the show. (Id.). John would often travel with petitioner and they would go to malls, radio shows

and television studios together. (Id. at 304). When John traveled with petitioner, they would

often sleep in the same bed. (Id. at 305-06).

During July or August 1995, when John was eleven (11) years old, he and petitioner stayed with the Wald family in Water Mill, New York. (Id. at 309). He and petitioner slept together in the guest bed. (Id. at 310). During the middle of the night, petitioner climbed on top of John and petitioner's anus was touching John's penis. (Id. at 311-12, 391). John later testified that there was penetration. (Id. at 359). John tried to push petitioner off of him, but petitioner was holding John down by his arms. (Id. at 313). Eventually, petitioner stopped and John went to sleep. (Id. at 314). Later, petitioner told John not tell anyone what happened, or petitioner would ruin his parents. (Id. at 315). After the incident, John continued working with petitioner as a clown. (Id. at 316).

In late November 1999, when John was fifteen (15), he testified that he again stayed with petitioner at the Wald home. (Id. at 317). This time, John's father, John Spinosa Sr. ("John Sr."), was in the room with them; John and John Sr. shared a bed, and petitioner slept on the couch. (Id.). During the night, John woke up and petitioner's mouth was on John's penis. (Id. at 318-19). John tried to wake his father up by poking him and petitioner stopped when John Sr. awoke momentarily. (Id. at 319). John Sr. testified that when he woke up in the morning, he went to use the facilities. (Id. at 178). When he returned to the bed, he noticed that petitioner was lying across the bottom of the bed. (Id. at 179).

John Sr. had become suspicious of petitioner and John's relationship after he overhead a phone conversation between the two in the summer of 1999. (Id. at 173-74). John Sr. spoke to John the day after the November 1999 incident and as a result of their conversation, John Sr. decided to install a security camera in his house because petitioner would often stay overnight at the Spinosa home. (Id. at 182).

2

On December 17, 1999, petitioner was staying overnight at the Spinosa home. He and the Spinosa family fell asleep in the Spinosa living room. John fell asleep on his living room couch. (Id. at 324). When he woke up, he discovered petitioner was fondling his (John's) penis. (Id. at 324-25). John Sr. observed the incident and then went upstairs to view the security camera. (Id. at 187). John Sr. watched as petitioner became very aggressive with John and then put his mouth on John's penis. (Id. at 192, 326). John Sr. then went downstairs and confronted petitioner. (Id. at 193). When John Sr. came downstairs, petitioner still had his hand inside John's pants. (Id.). According to John Sr., petitioner then admitted that he molested John. (Id. at 194). John Sr. then called the police. (Id. at 194). John did not know anything about the security camera until after the incident. (Id. at 328).

John Sr. also testified that during the summer of 1995, John and petitioner stayed at the Wald family home "a few times" by themselves. (Id. at 229).

Joyce Spinosa, John's mother, testified that John first met petitioner in 1993, when John was eight (8) or nine (9) years old. (Id. at 87-89). She stated that petitioner began to sleep over at the Spinosa house in 1994, and by 1995, petitioner stayed there "pretty often." (Id. at 90). Joyce testified that John and petitioner often went away together to work as clowns. (Id. at 91-92). Joyce specifically recalled a trip that John took with petitioner during Easter in 1999 where petitioner paid for John's airline ticket. (Id. at 93). Beginning around 1995, petitioner spent many holidays and birthdays with the Spinosa family and petitioner would often go to the movies and to restaurants with the Spinosa family. (Id. at 128). Throughout the family's relationship with petitioner, petitioner gave John gifts, including clothing and an expensive watch. (Id. at 93). Joyce testified that petitioner was "like [her] son" and a "best friend, both." (Id. at 142).

3

Before the incident on December 18, 1999, Joyce testified that her son John would wet the bed and that she had taken John to a cardiologist because John "thought he was having a heart attack;" "he was nauseous;" and "he was having pains in his chest and all kinds of stuff." (Id. at 98, 104). The doctor told Joyce that his chest pains were stress related. (Id. at 105). Joyce recalled a time when John and petitioner had a loud verbal argument in November 1999 because John did not want to go on a trip with petitioner. (Id. at 106). During the fight, John, who was fifteen (15) at the time, threatened to kill petitioner with a metal baseball bat that was in his hands. (Id. at 107).

Joyce also testified that John went to the Wald's home "many times" in 1995; sometimes John went with Joyce and petitioner and sometimes he went with petitioner only. (Id. at 94, 129). There was only one guest bed in the Wald's home so John and petitioner would sometimes sleep together. (Id. at 131). Joyce also testified that when the family would go on trips and stay in motels, petitioner would always sleep with John in the same bed. (Id. at 132).

Suffolk County Police Officer Frank Caruso ("Caruso") testified that he was assigned to the First Precinct on December 18, 1999. (Id. at 50). His partner was Officer Eugene Cipriano ("Cipriano"). (Id. at 51). At approximately 2:50 a.m., he received a radio call, and responded to 32 East Gate in Copiague, New York. (Id.). Caruso had a conversation with the homeowner, John Sr. outside; he and Cipriano then entered the premises. (Id. at 52). Caruso then requested a supervisor and petitioner was subsequently placed under arrest at 3:42 a.m., put into a police vehicle and driven to the First Precinct. (Id. at 55-56).

Detective Sneider ("Sneider") testified that he was assigned to the First Precinct on December 18, 1999. (Id. at 398-99). At approximately 3:00 a.m., he received a call to report to

4

the First Precinct. (Id. at 399). Upon his arrival, Sneider observed petitioner in the interview room and he then drove to 32 East Gate to interview the Spinosa family. (Id. at 400-01). After interviewing the Spinosa family, Sneider returned to the First Squad at approximately 7:30 a.m. (Id. at 404). He approached petitioner, who was under arrest and seated in the interview room. (Id. at 405). Before Sneider spoke with petitioner, he provided him with a card bearing the Miranda warnings and asked him to read it. (Id. at 409-10).

Before petitioner signed the card, Sneider asked him whether he understood what the card said, and petitioner said yes. (Id. at 412). Sneider asked petitioner if he wanted to contact a lawyer and petitioner said that "he didn't." (Id.). When Sneider asked petitioner if he wanted to talk without a lawyer, petitioner said that "he did." (Id.). Petitioner signed the card and Sneider placed his initials on it, as well as the date and the central complaint number. (Id. at 410, 412-13). Sneider and petitioner then had a conversation about John for approximately thirty (30) to forty-five (45) minutes. (Id. at 414).

Sneider then reduced their conversation to a three (3) page document, which he and petitioner signed. (Id. at 414-15). Prior to signing the statement, petitioner was again advised of his Miranda rights. Petitioner initialed each Miranda statement on the document that he was given. (Id. at 419-22). In the statement, petitioner admitted to having a relationship with John and it escalated in 1998 when they would perform oral sex on each other. (Respondent's Memorandum of Law, dated Nov. 25, 2005 at 3 (quoting Huntley Hearing at 43)). Petitioner also confessed to the events which occurred on December 18, 1999. (TT at 424). Sneider transcribed petitioner's statement and petitioner was then given an opportunity to review it. (Id. at 425). Petitioner made corrections to the statement, signed all three pages of the statement and added a

line in his own handwriting which stated, "I feel this behavior is unacceptable and will never happen again." (Id. at 425-26).

Eileen Treacy, a sexual abuse expert, also testified for the State. She described "child sexual abuse syndrome," as the "interaction that goes on between the child and the offender and also the impact that that has on the child's psychology." (Id. at 485). The defense did not present any witnesses.

Petitioner was convicted of Sodomy in the Third Degree (Penal Law § 130.40) and Endangering the Welfare of a Child (Penal Law § 260.10) for events that occurred on December 18, 1999. He was also convicted of two counts of Sodomy in the First Degree (Penal Law § 130.50), Sodomy in the Second Degree (Penal Law § 130.45), two counts of Sexual Abuse in the First Degree (Penal Law § 130.65), Sexual Abuse in the Second Degree (Penal Law § 130.60) and Endangering the Welfare of a Child for the crimes occurring in July or August of 1995. Defendant was acquitted of the crimes which were alleged to have occurred in November 1999. On December 18, 2001 defendant was sentenced to two concurrent indeterminate sentences of eight and one-third (8 1/3) to twenty five (25) years in state prison.

II.    Procedural History

In his direct appeal, petitioner raised three issues that he is now raising in this petition: (1) that there was insufficient evidence to support his conviction; (2) that the prosecutor engaged in misconduct during summation; and (3) that there was a Miranda violation while petitioner was in police custody. Petitioner's application to set aside the verdict, pursuant to C.P.L. § 330.30 was denied by the trial judge in a written decision dated December 17, 2001. In their decision affirming petitioner's conviction, the Appellate Division held:

6

Viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 N.Y.2d 620, 454 N.E.2d 932, 467 N.Y.S.2d 349 [1983]), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (see CPL 470.15 [5]).

The defendant's arguments regarding alleged prosecutorial misconduct do not warrant reversal. The prosecutor's summation comments regarding the defendant's statements to the police and the evidence supporting the charges relating to the 1995 incident were either fair comment on the evidence (see People v Ashwal, 39 N.Y.2d 105, 347 N.E.2d 564, 383 N.Y.S.2d 204 [1976]) or responsive to arguments presented in the defense counsel's summation (see People v Galloway, 54 N.Y.2d 396, 430 N.E.2d 885, 446 N.Y.S.2d 9 [1981]). With regard to those prosecutorial comments that were, however, improper, the trial court's immediate admonitions and curative instructions, along with the trial court's general instructions at the beginning of the trial and at the conclusion of the trial, served to eliminate any possibility of prejudice to the defendant (see People v Ramos, 205 A.D.2d 404, 613 N.Y.S.2d 879 [1994]; People v Perez, 132 A.D.2d 579, 517 N.Y.S.2d 559 [1987]).

Additionally, the evidence supports the hearing court's determination that the defendant was adequately apprised of his Miranda rights (see Miranda v Arizona, 384 U.S. 436, 430 N.E.2d 885, 446 N.Y.S.2d 9 [1966]) and that he knowingly, intelligently, and voluntarily waived those rights. Accordingly, the statements he made after he had been administered his Miranda warnings were admissible (see People v Miller, 268 A.D.2d 600, 702 N.Y.S.2d 851 [2000]).

The defendant's remaining contentions are without merit.

People v. Bayer, 302 A.D.2d 602, 755 N.Y.S.2d 295 (2d Dep't 2003). The New York Court of

Appeals denied petitioner's leave to appeal on May 29, 2003. People v. Bayer, 100 N.Y.2d 536,

793 N.E.2d 415, 763 N.Y.S.2d 1 (2003).

Petitioner filed a C.P.L. § 440.10 motion in Suffolk County on May 14, 2004. In that

motion, petitioner alleged that he received ineffective assistance of trial counsel because his counsel failed to call certain "alibi" witnesses to testify on his behalf. That motion was denied by Judge Hinrichs on December 6, 2004. People v. Bayer, CASE NO. 2938-99 (Suffolk County Ct. Dec. 6, 2004). The court held that the potential witnesses were not alibi witnesses because they could not have placed petitioner at a location other than the location where the crime occurred. Id. at 3. Furthermore, the court noted that trial counsel had a strategy and should be credited with obtaining acquittals on four (4) of the fifteen (15) counts against petitioner. The Appellate Division denied petitioner leave to appeal the denial of his post-conviction motion on July 26, 2005. (See Habeas Petition, dated July 29, 2005 ["Petition"], at 10).

III.     The Current Petition

Petitioner alleges: (1) the evidence was insufficient as a matter of law; (2) petitioner's post-arrest statements should have been suppressed; (3) prosecutorial misconduct; and (4) ineffective assistance of trial counsel. (See Petition). However, in his brief petitioner only addresses two issues: ineffective assistance of counsel and sufficiency of evidence.

A.     Jurisdictional Requirements

A petitioner seeking habeas corpus review must satisfy certain jurisdictional requirements. The first line of inquiry is whether the petition is barred by the applicable statute of limitations. In Lindh v. Murphy, 521 U.S. 320 (1997), the Supreme Court held that the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244, which imposes a one-year statute of limitations on habeas corpus petitions, applies prospectively to "the general run of habeas cases" that are "filed after the date of the Act." Lindh, 521 U.S. at 327; see also Boria v. Keane 90 F.3d 36, 37-38 (2d Cir. 1996) (per curiam). AEDPA states in pertinent

8

part:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of - (A) the date on which judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.

28 U.S.C. § 2244(d)(1). Here, Bayer filed his habeas petition on July 29, 2005, well after the effective date of the Act. According to Lindh, AEDPA's provisions, including the one-year statute of limitations, apply to his petition. Thus, to determine whether the petition is timely under the provisions of the Act, the court must calculate one year from the latest of the dates provided for in 28 U.S.C. § 2244(d). A conviction becomes "final" under AEDPA when the highest state court concludes its direct review or when the time to seek direct review in the United States Supreme Court by writ of certiorari expires (which is ninety (90) days after entry of the judgment of conviction or of the order denying discretionary review). See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).

The one-year period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). "If utilized, this tolling provision 'excludes time during which properly filed state relief applications are pending,' but it does not restart the statute of limitations clock." Williams v. Breslin, No. 03 Civ. 1848, 2004 U.S. Dist. LEXIS 1770 (S.D.N.Y. Feb. 11, 2004) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000)).

On August 27, 2003, ninety (90) days after the Court of Appeals denial, petitioner's time to seek a writ of certiorari with the United States Supreme Court expired. On August 21, 2004,

9

AEDPA was tolled because petitioner moved to set aside his sentence pursuant to Section 440.10 of New York's Criminal Procedure Law. Petitioner still had six (6) days with which to file his habeas petition. The Appellate Division denied leave to appeal on July 26, 2005. Petitioner filed the instant motion three (3) days later, on July 29, 2005; therefore, his petition is timely.

IV.    Analysis

    A.    AEDPA Standard

When the state court has rejected the petitioner's claim on the merits, as is the case here, a federal court considering a habeas corpus petition under 28 U.S.C. § 2254, as amended by AEDPA, must defer to the state court's rejection of the claim, and must deny the writ unless the state-court adjudication (1) "was contrary to," or (2) "involved an unreasonable application of," clearly established federal law "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Williams v. Taylor, 529 U.S. 362, 367 (2000); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005).

In Williams, the Court held that "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413. The Second Circuit has concluded that an "objectively unreasonable" application of Supreme Court precedent falls somewhere between "merely erroneous and unreasonable to all reasonable jurists." Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000). "If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

10

B.      Sufficiency of the Evidence

A defendant's Fourteenth Amendment right to due process of law is violated if he has

been convicted based upon evidence that is legally insufficient to prove the elements of the crime

charged. Jackson v. Virginia, 443 U.S. 307, 316-17 (1979). Petitioner alleges that he was denied

due process of law when he was convicted of the 1995 incident on legally insufficient evidence.

According to petitioner, "no 'rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.'" (Memorandum of Law In Support of Petition for Writ of

Habeas Corpus, dated Jan. 19, 2006 [Petitioner's Mem."], at 26) (quoting Jackson, 443 U.S. at

319). Petitioner states:

> the prosecution claimed that the petitioner sat on the complainant,
> who was then 11 years old, and had the complainant anally
> sodomize him while the complainant was sleeping.  These bizarre,
> anatomically improbable if not impossible allegations were
> repeated nowhere else in the indictment. . . . Such testimony was,
> on its face, incredible.  [I]t defies belief and common sense to
> imagine a grown man would be able to force an 11 year old child
> to anally penetrate him, let alone accomplish such an act while the
> child was asleep.  Furthermore, in general, the complainant's
> testimony lacked strength, coherence and the ability to remember
> that it was incredible as a matter of law.

Id. at 26-27. Petitioner does not analogize or contrast these facts to other cases, but rather,

simply states that the court's conclusion was an unreasonable application of Jackson.

In order for the petitioner to prevail on this claim, he must show that no rational trier of

the facts could have found petitioner guilty beyond a reasonable doubt. Nelson v. Smith, 618 F.

Supp. 1186, 1194 (S.D.N.Y. 1985) (quoting Jackson, 443 U.S. at 324). Put another way,

sufficient proof of guilt exists if, "after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

In viewing the evidence, the court must construe all reasonable inferences from the facts in favor of the prosecution so that questions of fact, conflicts in testimony and the weight of the evidence are resolved in favor of the guilty verdict. United States v. Salerno, 868 F.2d 524, 530 (2d Cir. 1989). Petitioner bears a "heavy burden" in challenging the sufficiency of the evidence supporting his conviction; he must show that the Appellate Division's application of Jackson was not merely incorrect, but objectively unreasonable. See 28 U.S.C. § 2254(d)(1).

A sufficiency of evidence claim is essentially a state law question. Howe v. Scully, 582 F. Supp. 277, 278-79 (S.D.N.Y. 1984). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). The reviewing court must assume that the jury credited the prosecution's witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it. Jackson, 443 U.S. at 319.

John was seventeen (17) at the time of trial. The jury credited his testimony, the testimony of his parents and the testimony of a child sexual abuse expert. The jury verdict is supported by the record. See Mallette v. Scully, 752 F.2d 26, 31 (2d Cir. 1984). John, Joyce and John Sr. all testified that petitioner and John stayed at the Wald home together in the summer of 1995. (TT at 94, 129, 229). Although John was unable to recall specific dates, it is not unreasonable to conclude, as this jury did, that John provided sufficient proof to find petitioner guilty of the crimes charged in the indictment. While petitioner's brief seems to imply that John

may not have known petitioner in 1995, this is belied by petitioner's own statement to the police; in his statement, petitioner wrote that "since 1992, I have had a relationship with the Spinosa family." (TT at 423-24).

John stated in his grand jury testimony and in his trial testimony that in July or August 1995, petitioner's penis was in John's anus during the encounter. (TT at 358-59). In any event, for the purposes of defining sexual abuse, sexual contact is "any *touching* of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party" (N.Y. Penal Law § 130.00, subd 3) (emphasis added). Penetration is also not a necessary element of sodomy (Arkim v. Irvin, 996 F. Supp. 245, 250 (W.D.N.Y. 1998)) although it was in the State's bill of particulars and the prosecution was therefore obligated to prove it. (TT at 628). As the judge noted, "penetration is penetration of any degree." (Id. at 634). The jury credited John's testimony and found that there was penetration.

After a number of read backs, the jury convicted petitioner on these counts, and acquitted him of the charges arising out of the November 1999 incident. The Appellate Division, Second Department, has already ruled that there was sufficient evidence to find petitioner guilty beyond a reasonable doubt. Bayer, 302 A.D.2d at 602. Considering that there was a videotape which confirmed petitioner's abuse of the juvenile victim in 1999, that the prosecution presented credible witnesses, that petitioner signed a confession statement, that petitioner conceded to having known John since 1992 and that petitioner faces a heavy burden, the Appellate Division's decision was not "contrary to" or an "unreasonable application of" clearly established federal law.

13

C.  Petitioner's Post-Arrest Statements

Under the Supreme Court's decision in <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966), a criminal suspect must be advised of his rights and waive them before a statement that he makes during a custodial interrogation may be used against him. The Appellate Division ruled on the merits and found that petitioner was adequately apprised of his <u>Miranda</u> rights, and "he knowingly, intelligently, and voluntarily waived those rights." <u>Bayer</u>, 302 A.D.2d at 603. Therefore, AEDPA's deferential standard of review applies to this claim. The facts indicate that defendant was aware of his rights and knowingly waived them. Petitioner does not address this argument in his current brief, but in his petition, he states that he was "not properly advised of his Miranda rights" and he was "handcuffed to a desk for many hours prior to questioning and signing a three page written statement." (Petition at 7).

Petitioner was arrested and placed in police custody prior to being interviewed. Sneider testified that petitioner was never hit or threatened at any time during the interview. (TT at 427). There is no evidence to the contrary. The officer properly apprised petitioner of his <u>Miranda</u> rights; petitioner voluntarily waived those rights. (TT at 410-13, 419-422); <u>see also Bayer</u>, 302 A.D.2d at 603. Based upon the foregoing, the Appellate Division's decision was not "contrary to" or an "unreasonable application of" clearly established federal law.

D.  Prosecutorial Misconduct

Petitioner alleges that the prosecutor failed to "correct the false testimony of its expert witness" and that the prosecutor "exceeded the bounds of fair comment during summation."

(Petition at 9). Petitioner does not address either argument in his brief.[1] The Appellate Division, Second Department, ruled on the merits and found that there was no prosecutorial misconduct. Bayer, 302 A.D.2d at 603. With regard to the improper comments that were made, the court ruled that the trial court's "immediate admonitions and curative instructions, along with the trial court's general instructions at the beginning of the trial and at the conclusion of the trial, served to eliminate any possibility of prejudice to the defendant." Id. Therefore, AEDPA's deferential standard of review applies to this claim.

Prosecutorial misconduct violates a defendant's due process rights only when it is of "sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). See also United States v. Muja, 102 Fed. Appx. 212, 215 (2d Cir. 2004) ("It is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required.") (quotations omitted); United States v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002) (finding that even on direct federal appeal, "[b]efore a conviction will be reversed, a prosecutor's comments on summation must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.' The defendant must point to 'egregious misconduct.'") (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 647 (1974)); United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) ("To warrant reversal, the prosecutorial misconduct must cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.") (internal quotations omitted), cert. denied, 537 U.S. 988

---

[1] Petitioner does not address the expert's alleged "false testimony" in his brief. Therefore, the court is unable to address this argument.

(2002). See also United States v. McCarthy, 54 F.3d 51, 55 (2d Cir. 1995), cert. denied, 516 U.S. 880 (1995); Blissett v. LeFevre, 924 F.2d 434, 440 (2d Cir. 1991), cert. denied, 502 U.S. 852 (1991). In other words, "the law is settled that federal habeas relief is not available on the basis of improper prosecutorial statements at trial unless the errors, in context of the summation as a whole, were so fundamentally unfair as to deny petitioner a fair trial." Tejeda v. Senkowski, 92 Civ. 3012, 1993 U.S. Dist. LEXIS 8166, at *7 (S.D.N.Y. June 16, 1993) (internal quotations omitted).

Even if the prosecutor's comments were considered inappropriate, the Supreme Court has held that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11-12 (1985).

In this case, defense counsel failed to contemporaneously object to the prosecutor's statements as to when the abuse first began. (TT at 623-24). Moreover, any prejudicial effect from the prosecutor's summation concerning the Wald family was cured by the trial judge's cautionary instructions and rulings. (Id. at 637). The jury is presumed to obey a court's curative instruction. See Greer, 483 U.S. at 767 n.8 ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence . . ., unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions."); Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("juries are presumed to follow their instructions").

Taken as a whole, the prosecutor's comments on summation were fair and there was no due process violation. Therefore, the Appellate Division's ruling was not "contrary to" or an

16

"unreasonable application of" clearly established federal law.

     E.     Ineffective Assistance of Counsel

The Sixth Amendment to the U.S. Constitution provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added). The Supreme Court has explained that the purpose of the Sixth Amendment is "to ensure a fair trial" and therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). See also Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) ("[T]he essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.").

To prove a claim of ineffective assistance of counsel petitioner must demonstrate that: (1) his counsel's performance was constitutionally deficient; and (2) the deficient performance prejudiced his defense. Strickland, 466 U.S. at 687. With regard to the first prong, the Supreme Court has stated that a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.

Under the second prong, petitioner must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Id. However, "[t]he result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable." Strickland, 466 U.S. at 690-91. According to Strickland, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

Petitioner claims trial counsel was ineffective for failing to call alibi witnesses for the 1995 incident. Judge Hinrich noted that petitioner could only appeal the failure to call alibi witnesses in his 440.10 motion because any claim of ineffectiveness other than the "failure to pursue the alleged alibi would have to be dismissed for failure to have raised it upon the direct appeal." People v. Bayer, CASE NO. 2938-99 (Suffolk County Ct. Dec. 6, 2004), at 2 (quoting C.P.L. §440.10(2)(c)). In his petition, plaintiff's only claim appears to be that trial counsel was ineffective for failing to call alibi witnesses.

John alleged that the first sexual contact between him and petitioner occurred in July or August of 1995. Petitioner alleges that he was working every night in the summer of 1995 and as such, he would not have been able to travel to the Wald's home. Judge Hinrich, in denying petitioner's motion, held that the witnesses petitioner wanted to call were not true alibi witnesses because they could not state that petitioner was at a place other than the scene of the crime at the time of the charged counts in 1995. Rather, the witnesses could only testify to the fact that it would have been difficult for petitioner to have traveled from the circus to the Wald's home. Judge Hinrich also found that trial counsel's decision not to call purported alibi witnesses was a

18

calculated strategic decision in light of the fact that there was a 1999 videotape which confirmed petitioner's abuse of the same juvenile victim; the Appellate Division, Second Department denied leave to appeal. (Petition at 11). Therefore, AEDPA's deferential standard applies to a review of this claim.

According to petitioner, Timothy Orris ("Orris"), Jimmy James ("James") and Renee Story ("Story") would have testified that due to petitioner's work schedule as a clown, it would have been physically impossible for him to be with John at the Wald's home during any weekend night in the summer of 1995. (Petitioner's Mem. at 6). Had they been called to testify, Orris and James would have testified that first year clowns were forbidden to drive and that petitioner did not have access to an automobile in 1995. (Id. at 10). James would have also testified that he was with petitioner "almost all the time" and that he could not recall petitioner missing a performance in 1995. "The affidavits and documentary proof demonstrated that it would have been virtually impossible for him to leave the circus at 10 p.m. at night, pick up John Spinosa [i]n Copiague, travel to Water Mill in time to 'play clown games' and then return to the location of the circus by early the next morning." (Id. at. 18). "Had [the jury] had before them [petitioner's] work schedule and the testimony of his co-workers at the circus, this jury would likely [have] found reasonable doubt about the 1995 charges . . . ." (Id. at 20).

However, petitioner concedes that he was in the northeastern United States in May, June, July and August of 1995. (Id. at 24). More specifically, petitioner was in Queens, Brooklyn and Long Island throughout late July and early August, precisely when John said the conduct occurred in Water Mill, New York (Long Island). (Affidavit of Jimmy James, dated Aug. 20, 2004 ["James Aff."], Ex. 1).

Interestingly, in the July/August 1995 issue of *The Big Top*, a magazine which petitioner provides to this court, there is an article about petitioner which notes that, while performing during the summer of 1995, petitioner had a "few accidents," including a "mild concussion." (James Aff., Ex. 2). In the article, petitioner states that, "[a]ll the clowns practice each part [of] the routines so they can interchange if someone is hurt or ill." (Id.) Therefore, although James might have testified that petitioner never missed a performance, petitioner's own submission suggests otherwise. Further, according to trial testimony and petitioner's own statement to the police, petitioner began to work as an "advance clown" where he would travel by himself, on his own schedule. (TT at 303, 423) (According to petitioner's statement to the police, he was "an advance clown" which meant that he went to "towns a week before the circus, for publicity purposes."). Thus, even assuming that the witnesses were available to testify and testified that petitioner had a busy work schedule, their testimony would not have been dispositive in light of the fact that John, Joyce and John Sr. all testified that John and petitioner were at the Wald family home together in the summer of 1995.

Moreover, trial counsel's strategy of criticizing the victim's father for videotaping the December 1999 incident was a partially successful strategy. The State dismissed the two most serious counts related to the December 1999 incident just prior to trial and petitioner was acquitted of the counts related to the November 1999 incident. As Judge Hinrich noted, "[t]his strategy [of criticizing John's father] may not have been as successful had counsel presented alibi witnesses to say [petitioner] could not have been with the victim in 1995, in the face of a videotape confirming [petitioner's] abuse of the very same juvenile victim in 1999."

Courts are reluctant to disturb a decision not to call a particular witness which usually

20

falls under the realm of trial strategy. See <u>United States v. Luciano</u>, 158 F.3d 655, 660 (2d Cir. 1998); <u>United States ex rel. Walker v. Henderson</u>, 492 F.2d 1311, 1314 (2d Cir. 1974). The selection of trial witnesses is a "tactical decision of the sort engaged in by defense attorneys in almost every trial." <u>United States v. Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987). After reviewing the trial transcript in its entirety, I find that petitioner's counsel was diligent, competent and strategic. Petitioner has not shown that his trial counsel's failure to call these witnesses fell below an objectively reasonable standard of representation or prejudiced his defense. See <u>Strickland</u>, 466 U.S. at 687.

VI.     Conclusion.

For the reasons noted above, petitioner's habeas petition is denied in its entirety. No certificate of appealability is granted with respect to any of the petitioner's claims because the petitioner failed to make a substantial showing of any denial of his constitutional rights. The petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. <u>See</u> 28 U.S.C. § 2253.

IT IS SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: December 3, 2006
        Central Islip, NY

Copies to:

21

Robert J. Boyle, Esq.
350 Broadway
Suite 308
New York, NY 10013

Thomas C. Costello
Suffolk County District Attorney
Criminal Courts Building
200 Center Drive
Riverhead, NY 11901